# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# BRYSON CITY DIVISION

## CIVIL CASE NO. 2:11cv33

| | |
|---|---|
| DONALD JENSEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| WESTERN CAROLINA UNIVERSITY, | ) |
| UNIVERSITY OF NORTH CAROLINA, | ) |
| ROBERT McMAHAN, in his individual and | ) |
| official capacities, MARY ANN LOCHNER, | ) |
| in her individual and official capacities, | ) |
| JAMES ZHANG, in his individual and | ) |
| official capacities, and | ) |
| EARNEST HUDSON, JR., in his individual | ) |
| and official capacities, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OF DECISION AND ORDER

THIS MATTER is before the Court on the Defendants' Motion for

Summary Judgment [Doc. 30] and the Plaintiff's Motion for Relief from Order

[Doc. 51].

## PROCEDURAL HISTORY

The Plaintiff Donald Jensen (Jensen) initiated this action on September

1, 2011. [Doc. 1].   The dispute among the parties stems from Jensen's

employment as an instructor at Western Carolina University (WCU). [Id.].

Before any responses to that Complaint were made, Jensen filed an Amended Complaint on September 19, 2011. [Doc. 8].

On February 20, 2012, with the Defendants' consent, Jensen amended his Complaint again. [Doc. 15; Doc. 16]. In that pleading, Jensen added a new claim pursuant to 42 U.S.C. §1983 for denial of due process in violation of the Fourteenth Amendment against WCU and the University of North Carolina (UNC) seeking injunctive relief only. [Doc. 15]. He also asserts this claim against the remaining Defendants in their individual capacities seeking compensatory damages. [Id.]. In the second cause of action, Jensen alleges a claim for breach of employment contract against WCU and UNC as well as the remaining Defendants in their official capacities. [Id.]. In Jensen's third cause of action, he alleges a claim pursuant to §1983 for violation of the First Amendment, seeking injunctive relief only against WCU and UNC but asserting a claim for compensatory damages against the remaining Defendants whom he sues in their individual capacities. [Id.]. In the fourth cause of action, Jensen alleges a claim pursuant to N.C. Gen. Stat. §126-85, the so-called state Whistleblower Act, against all of the Defendants seeking both compensatory damages and equitable relief. [Id.]. A fifth claim of defamation was asserted only against Defendants Hudson, Zhang and

McMahan in their individual capacities. [Id.]. Jensen's sixth claim for state law civil conspiracy was asserted against the individual Defendants only in their individual capacities. [Id.]. In his last claim Jensen asserted a Title VII violation by WCU and UNC only. [Id.].

On August 20, 2012, the Defendants timely filed the pending Motion for Summary Judgment. [Doc. 26; Doc. 30]. In response to that motion, Jensen filed a motion for leave to file yet another amendment to the Complaint which would delete the Title VII cause of action and substitute in its stead a claim pursuant to Title IX of the Education Amendments of 1972 Act, 20 U.S.C. §1681 (Title IX). [Doc. 37]. The next day, he moved to voluntarily dismiss without prejudice the breach of contract claim and the request for equitable relief sought in connection with the Whistleblower claim. [Doc. 40]. The Defendants' attorney reported their objection to dismissal without prejudice, presumably for the same reasons as stated in their pending motion for summary judgment.[1] Jensen also sought to dismiss without prejudice the Title VII claim, conceding that no such claim was viable on these facts. [Doc. 40 at 2]. Plaintiff has given no reason as to why he seeks to dismiss this claim without prejudice, even though he concedes that it is not viable.

---

[1]The Defendants did not file separate memorandum in opposition to the motion for voluntary dismissal since those same issues had been briefed in support of their pending motion for summary judgment. [Doc. 31].

3

On November 7, 2012, this Court denied Jensen's motion for leave to amend the complaint, dismissed the Title VII claim with prejudice and denied the motion to dismiss without prejudice the breach of contract claim and the request for equitable relief contained within the Whistleblower claim. [Doc. 50]. Six days later, Jensen filed a Motion for Relief from Order which is addressed herein. [Doc. 51].

## STANDARD OF REVIEW

> Under the Federal Rules of Civil Procedure, summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, ... show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has observed, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003), cert. denied 541 U.S. 1042, 124 S.Ct. 2171, 158 L.Ed.2d 732 (2004) (emphasis in original).

A genuine issue of fact exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994), cert. denied 513 U.S. 814, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). "Regardless of whether he

4

may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)).  If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist.  Id.

A party opposing a properly supported motion for summary judgment

"may not rest upon the mere allegations or denial of [his] pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial."  Furthermore, neither "[u]nsupported speculation," nor evidence that is "merely colorable" or "not significantly probative," will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that "reasonable minds could differ" on a material point, then, regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law," "summary judgment, if appropriate, shall be entered."

Id.

Nonetheless, in considering the facts for the purposes of a summary judgment motion, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party.  Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

5

## FACTUAL BACKGROUND[2]

Defendant Robert McMahan (McMahan) was the Dean of the Kimmel School at WCU from April 2008 until June 2011. [Doc. 30-7 at 1]. The Kimmel School houses both the Department of Engineering and Technology (Engineering Department) and the Department of Construction Management (CM Department). [Id.]. In July 2009, McMahan appointed Defendant James Zhang (Zhang) as the Interim Department Head of the CM Department. [Id. at 2]. Jensen was a tenure track faculty member of the CM Department during this time. [Id.].

Due to his position as the Interim Director of the CM Department, Zhang was the non-voting Chair of the CM departmental collegial review committee for Jensen's reappointment review during the 2009-2010 academic year. [Doc. 30-15 at 1-2]. Zhang testified that the committee met on November 19, 2009 at which time concerns were raised about the fact that Jensen had published articles in the same journal for which he was the editor. [Id.]. Zhang met with Jensen on December 9, 2009 to discuss his reappointment review and at that time, communicated to Jensen the concerns about the

---

[2]In considering the factual allegations of the parties, the Court has excluded inadmissible evidence as well as evidence based solely on speculation and conjecture. Bouchat, 346 F.3d at 522 ("[N]either unsupported speculation, nor evidence that is merely colorable or not significantly probative will suffice" to withstand summary judgment.).

6

journal. [Id. at 2]. Zhang also discussed some incidents that had occurred between Jensen and other faculty members in the CM Department. [Id.]. Those included a September 2009 incident between Jensen and Dr. Ray Godfrey (Godfrey) wherein they had a disagreement during which Godfrey asked Jensen to leave his office. [Id.]. Zhang also spoke with Jensen concerning a November 2009 incident when Jensen became angry with an adjunct professor, Robert Ford (Ford), because Ford had worked with another faculty member to schedule a speaker for the CM Student Club meeting. [Id.]. They also discussed Jensen having repeatedly complained to Zhang about Dr. Ron Mau with whom Jensen edited a journal. [Id.]. According to Jensen, Mau did not put forth sufficient effort regarding the journal. Jensen responded to Zhang's concerns by insisting that he had no problems working with other faculty members. [Id.]. Jensen was reappointed for another academic year. [Id.].

On January 11, 2010, Jensen stopped Zhang in the parking lot at WCU to complain about the December 9 meeting during which his reappointment was discussed. [Id.]. Despite having been reappointed for another academic year, Jensen repeatedly asked Zhang who had complained about him and during the hour long conversation, reported that Zhang had ruined Jensen's Christmas break. [Id.].

7

During a faculty meeting on January 13, 2010, Zhang observed that Jensen again became angry with Ford because Ford suggested that CM Department students be allowed to take a one credit hour course on presentations. [Id.]. When Ford left the meeting to teach his class, Zhang described Jensen's behavior as "bluster[ing] furiously," and Jensen angrily stated that Ford should not be on the faculty. [Id.].

Zhang testified that on January 25, 2010, both Jensen and Godfrey reported another incident between them to Zhang. [Id. at 3]. Although Zhang offered to mediate their disagreement, both declined his offer. [Id.].

McMahan has provided an affidavit in which he described a report made to him on January 25, 2010 by his executive assistant, Pat Smith (Smith). [Doc. 30-7 at 2]. Smith told McMahan that she witnessed a dispute between Jensen and Godfrey during which Godfrey left and was followed by Jensen who "stormed out after him, red-faced with rage." [Id.]. Smith told McMahan that she felt Jensen was erratic and she was afraid of working around him. [Id.].

On February 24, 2010, Ford complained to McMahan that Jensen had given Ford a "death stare" and made derogatory comments to him because he offered an opinion during the CM Student Club meeting. [Id.; Doc. 30-15 at 3]. McMahan and Zhang met with Jensen to discuss this incident. [Id.].

8

Although McMahan endeavored to discuss with Jensen his difficulties with other faculty members, Jensen became defensive and demanded to know who had accused him of wrongdoing. [Id.]. McMahan ultimately brought Ford into the meeting and instructed the two men to work out their issues. [Id.]. Zhang has testified that after this meeting, a student reported to him that Jensen had approached students in the CM Student Club and asked them to sign statements to the effect that Jensen had not acted inappropriately toward Ford. [Doc. 30-15 at 2-3]. The student reported to Zhang that he had felt intimidated by Jensen and signed the requested statement for that reason. [Id.].

During the spring of each academic year, faculty members are evaluated by their department heads. [Id. at 3-4]. The evaluation is reported on a form called the Annual Faculty Evaluation (AFE). [Id.]. In Jensen's 2010 AFE, Zhang rated Jensen as satisfactory in all areas except collegiality. [Id.]. In that category, Jensen was assigned the rating of "concern" with the following comment: "Needs to work on interpersonal and leadership skills so he can work with other departmental faculty more effectively without resulting tension. Also needs to moderate reactions to consider effect on others around him." [Id. at 4].

Zhang scheduled a meeting with Jensen to discuss the AFE at 1:00 p.m.

9

on May 7, 2010.  [Id.].  While Zhang was in another meeting on that day, Jensen emailed to ask if the meeting could be at 11:00 a.m. but Zhang did not see the email until after that time.  [Id. at 3-4].  As a result, Zhang sent his administrative assistant, Alison Krauss (Krauss) to tell Jensen that the meeting would take place as scheduled at 1:00 p.m.  [Id.].  Zhang testified that Krauss came back from that encounter "visibly upset" and reported to Zhang that Jensen had become very angry and aggressively questioned her as to why his meeting could not have taken place at 11:00 a.m.  [Id.].

Zhang testified that he met with Jensen that day but when he attempted to discuss his concerns about collegiality, Jensen became extremely upset, angry, red-faced and confrontational.  [Id. at 4].  Jensen repeatedly demanded to know who had complained about him while "his eyes took on an intense, staring quality."  [Id.]. Jensen's behavior during the meeting was so extreme that Zhang became concerned about Jensen's emotional stability.  [Id.]. Jensen repeatedly asked Zhang to remove the comment in the AFE and refused to sign it.  [Id. at 5].  Zhang told Jensen that his next step would be to speak with McMahan and an appointment was made for May 19, 2010.  [Id.].

Zhang discussed this incident with McMahan.  [Id.].  They were so concerned by Jensen's reactions that they consulted Kathy Wong (Wong), the

Director of Human Resources at WCU and the chair of the WCU Workplace Violence Response Team (WVRT). [Id.]. Zhang met with that team on May 18, 2010. [Id.].

The next day, as previously scheduled, McMahan and Zhang met with Jensen. [Id.]. Zhang testified that Jensen was fixated on learning who had complained about him and refused to discuss the basis for their concerns. [Id.]. Jensen was so angry, aggressive, confrontational and at times threatening that they offered to refer him to the Employee Assistance Program. [Id.]. Jensen refused and demanded to see his personnel file. [Id.]. As a result, Jensen was referred to Wong in Human Resources who met with him on May 20, 2010. [Id.]. After Jensen had reviewed his personnel file in Wong's office, she asked him to meet with the WVRT and he agreed to do so. [Doc. 30-14 at 2]. During that meeting, several recommendations concerning collegiality were made to Jensen and he finally agreed to sign the AFE. [Id.]. Because the semester was finished and Jensen would be under less stress, the WVRT decided to take a "watch and see" approach rather making any formal recommendation to the administration. [Id.].

Prior to this meeting, Earnest Hudson (Hudson), the Director of Public Safety and Parking at WCU and a member of the WVRT, had obtained a criminal background check on Jensen. [Doc. 30-5 at 2]. Hudson testified that

the check disclosed that in 2008, Jensen had been charged with assault although the charges were later dropped.[3]  [Id.].  Hudson attended the WVRT meeting with Jensen on May 20, 2010 and specifically asked Jensen if he had ever been charged with a crime.  [Id.].  Jensen emphatically denied any such charge, conduct which in Hudson's mind "raised a red flag."  [Id.].  Hudson testified that he later learned that, in addition to the 2008 charge, a faculty member at Jensen's previous employer had filed a charge against Jensen for threatening him.  [Id.].  Despite concerns, Hudson agreed with Wong that no formal recommendations would be made to the administration at that time. [Id.].

During the summer of 2010, Zhang ended his term as interim department head, and resumed his ordinary professorial duties in the CM Department.  Jensen testified that on August 25, 2010, Gloria Patterson (Patterson) and Michele Bretz (Bretz), both students in the CM Department, came to Jensen's office and reported that Ford had inappropriately touched them. [Doc. 31-1 at 4].  Patterson's husband, who was also a WCU faculty member, came into the office as well and immediately stated that they should file a police report.  [Id. at 4-5].  Jensen suggested that they follow the protocol

---

[3]McMahan has also testified that he had learned in August 2008 that Jensen had been charged with assault. [Doc. 30-7 at 1].  After consultation with the General Counsel for WCU, it was determined that the matter should not be further explored. [Id. at 2].  McMahan forgot about this until the spring of 2010. [Id.].

set up by WCU in such circumstances.  [Id.].

Dr. Henry Wong (Dr. Wong), the Director of the Equal Opportunity and Diversity Programs at WCU, testified that on August 26, 2010, Patterson met with him. [Doc. 30-13 at 1].  One of Dr. Wong's duties was to investigate reports of unlawful sexual harassment.  [Id.].  Patterson told Dr. Wong that the first incident with Ford occurred on August 16, 2010 when she showed Ford pictures on her cell phone and Ford leaned in and placed his body next to hers.  [Id. at 1-2].  When she moved away, he did it again.  [Id. at 2].  Patterson reported to Dr. Wong that Ford "followed her" when she went outside to smoke.  [Id.].  On August 24, 2010, she claimed that Ford had moved his chair to sit next to her.  [Id.].  On August 25, 2010, he walked up behind her, shook her by the shoulder and laughed.  [Id.].  Dr. Wong followed up his meeting with Patterson by speaking separately with Patterson's husband, Bretz and Ford.  [Id.].  Dr. Wong also met with Jensen because Patterson had reported that she first informed Jensen about the incidents because he was her advisor.  [Id.].  Jensen confirmed to Dr. Wong that the first incident occurred in August 2010 and that he had not thought much about it until Patterson later came into his office in tears.  [Id.].  Dr. Wong investigated both the Patterson and Bretz complaints but concluded that no violation of sexual harassment policies had occurred.  [Id.].

13

On August 26, 2010, Patterson filed a complaint with WCU police alleging that Ford had inappropriately touched her and that he was "stalking" her. [Doc. 30-5 at 2]. Patterson later decided to press state charges against Ford and did so. [Id.].

Dr. Wong informed McMahan of the charge made by Patterson against Ford. [Doc. 30-7 at 3]. Because of the extreme reaction that Patterson had to the purported incidents, McMahan was concerned that there may have been a history of harassment by Ford. [Id.]. As a result, he decided to meet with Patterson as well as with Jensen who, as her advisor, McMahan thought might have heard of earlier such incidents. [Id.]. Jensen was very contentious during the meeting and defensive, asking what he was being accused of and by whom. [Id.]. McMahan later learned that Jensen thought he was being disciplined and so McMahan made a written report to clarify the purpose of the meeting. [Id.]. McMahan sent a memorandum to Jensen in which he stated:

> This is not a disciplinary memo, and you are not in anyway being held accountable for the actions of Bob Ford. My principal concern was and still is to make sure that you understand the university's policies and my expectations regarding student complaints about faculty members and other employees.

[Doc. 30-7 at 10].

Jensen has testified that he felt McMahan had attacked him during the

14

meeting and accused him of failing to properly report Patterson's complaints. [Doc. 31-1 at 2; Doc. 36-1 at 23].

In his deposition in this case Jensen related these facts from a different perspective and with a markedly different time line. He testified that he first told Zhang of the allegations against Ford in February 2010, not August. [Doc. 36-1 at 90]. He did not explain how this could be possible in light of Patterson's assertion that the first incident with Ford of which she complained occurred on August 16, 2010. Nonetheless, Jensen testified that he believed the complaints regarding his collegiality leading up to the negative statements in his May 2010 review and his meeting with the WVRT all stemmed from Ford's retaliation against him for having relayed Patterson's complaints to Zhang. [Id. at 90-93]. Jensen stated that, though he reported Patterson's complaints to Zhang, he did not pass on the details of the incidents. [Id. at 90-93]. Jensen reiterated in his deposition testimony that he did not "go into a whole lot more detail" than just to say that Patterson "was having difficulty." [Id. at 95].

Dr. Aaron Ball (Ball) was a member of the departmental collegial review committee for the 2009-2010 and 2010-2011 academic years. [Doc. 30-2]. During the committee's deliberations as to Jensen's reappointment, Ball expressed his concern that Jensen was publishing articles in a journal for

15

which he (Jensen) served as an editor. [Id. at 2].  Ball felt strongly that this was not ethical.  [Id.].  The committee had discussed this issue in 2009 and determined at that time to reappoint Jensen, but that Zhang should discuss this issue with him.  [Id.].

On November 17, 2010, the departmental collegial review committee for the CM Department met to consider Jensen's reappointment for the 2011-2012 academic year.  [Id.].  Ball, who was still a member of that committee, continued to feel very strongly that it was a serious ethical violation for Jensen to continue to publish articles in a journal for which he was the editor.  [Id.]. Ball voted against reappointment based on this issue.  [Id.].  At the time of this vote, Ball knew nothing about the Patterson and Bretz complaints or that Jensen had been involved in any way.  [Id.].  Indeed, those complaints were not discussed in any manner during the meeting.  [Id.].  The sole reason Ball did not vote for Jensen's reappointment was the ethics issue involving the journal.  [Id. at 3].  The committee voted by majority vote to reappoint Jensen. [Doc. 30-4 at 1-2].

Dr. Janet Yates (Yates), who had been appointed as the Department Head for the CM Department in June 2010, sent McMahan an email on November 22, 2010.  [Doc. 30-15; Doc. 30-7 at 4].  Yates reported that Jensen had received the results of the departmental committee.  [Id.].

Although the committee had voted to reappoint him, Jensen was upset that it was a mixed vote and he gave WCU "one day to rectify it or he will be filing his EEOC complaint." [Id. at 11].

Chip Ferguson (Ferguson) was a member of the departmental collegiality committee for the CM Department who had considered the question of Jensen's reappointment. [Doc. 30-4 at 1-2]. Just before Thanksgiving 2010, he was walking on campus when Jensen approached him and Wesley Stone (Stone), another faculty member. [Id.]. Jensen insisted that they go to his office, at which point he began to discuss the committee's vote. [Id.]. Jensen was extremely angry, shaking the review form and saying that he was "being thrown under the bus." [Id.]. Ferguson felt that Jensen's reaction was disproportionate to the situation because it was not uncommon for there to be a mixed vote in favor of reappointment. [Id.]. Jensen told Ferguson and Stone that they should tell Zhang that Jensen was "coming after him." [Id.]. What Jensen felt Zhang had to do with this he did not tell Ferguson or Stone. Although they both tried to calm Jensen down, he would not listen and they left his office to go into Ferguson's office. [Id.]. While Ferguson and Stone were discussing what to do in regard to this incident, Jensen appeared at Ferguson's office, still visibly upset and angry. [Id.]. Jensen said that he had learned who had voted against him. [Id.]. Ferguson

17

and Stone said they would not discuss the matter any further with Jensen and asked him to leave. [Id.]. Although he left, he came back a few minutes later, still angry. [Id.].

> We repeatedly told him he had to leave, that we would not talk to him about this. Dr. Jensen then indicated that he had signed letters supporting his collegiality from all but two colleagues. Dr. Jensen again accused Dr. Zhang of "throwing him under the bus." Dr. Stone and I decided that we had to report this both because of Dr. Jensen's persistence and the anger and intensity that Dr. Jensen exhibited. I found Dr. Jensen's anger extremely unnerving. I immediately reported the incident to Ken Burbank and I understand that Dr. Stone also reported the incident to Dr. Burbank.

[Doc. 30-4 at 2]. Stone has provided an affidavit in which he corroborates Ferguson's testimony. [Doc. 30-12].

Dr. Ken Burbank (Burbank) was the Department Head of the Engineering Department at WCU. [Doc. 30-7 at 12]. Burbank has testified that both Ferguson and Stone reported Jensen's contact with them to him and that on November 23, 2010, Burbank reported that conversation to McMahan. [Id.].

On January 26, 2011, the Kimmel School collegial review committee met to consider Jensen's collegiality issues. [Doc. 30-12 at 2-3]. Although the CM Department committee had voted in favor of Jensen's reappointment, the committee for the full Kimmel School also had to pass on the reappointment. [Id.]. Stone was the Secretary for the Kimmel School committee. [Id.]. The meeting began with a statement by Yates, the new Department Head for the

18

CM Department. [Id.]. Yates stated that there had been some collegiality issues with Jensen. [Id.]. Ferguson and Stone both recounted the incident they had experienced with Jensen in November 2010. [Id.]. The committee voted unanimously against reappointing Jensen. As the Secretary for the committee, Stone prepared the Transmittal Form for Reappointment, Form AA-12. [Id.]. The committee unanimously agreed to the contents of the form and the decision against reappointment. [Id.]. Stone wrote that "[t]he committee has grave concerns regarding multiple breaches of collegiality by Dr. Jensen over an extended period of time, involving both students and faculty. The committee unanimously does not recommend reappointment." [Doc. 39-6 at 2].

Stone has testified that during this meeting, there was no input from McMahan or anyone from the General Counsel's office. [Doc. 30-12 at 3]. There was no discussion or mention of Patterson and Bretz's allegations against Ford. [Id.]. Indeed, both Stone and Ferguson testified they were completely unaware of those allegations or of Jensen's involvement with the matter. [Id.]. Stone testified that he

> was worried how Dr. Jensen would react when presented with a unanimous vote against reappointment. Therefore, [he] asked Dean McMahan if security would be present when Dr. Jensen was notified of the vote. [Stone] believe[d] that Dr. Jensen [was] quick to anger and bec[a]me[ ] much angrier than a situation warrants. [Stone] was relieved when [he] learned that Dr. Jensen had been

19

assigned duties off campus for his terminal year after the negative reappointment decision.

[Id.].

Several of the other members of the committee who voted against reappointment also felt that Jensen might retaliate against them.  [Doc. 30-7 at 3-4].  Ferguson testified that

> [g]iven Dr. Jensen's reaction to the [November 2010] departmental vote, which was a positive result, even if one committee member had voted "no," [he] was concerned for [his] personal safety after the college [Kimmel School] committee unanimously voted against Dr. Jensen's reappointment.  The windows in [Ferguson's] office and lab had some "stops" which prevented them from opening completely. [Ferguson] removed these "stops" and began ensuring that my classroom door remained closed and locked while class was in session, and [he] began keeping [his] office door closed and locked when [he] was there.

[Doc. 30-4 at 3].

Based on these concerns, Hudson, the public safety director, was asked to meet with Jensen and to deliver to him the formal document denying him reappointment. [Doc. 30-5 at 3].  Hudson delivered this document to Jensen on January 31, 2011. [Id.].  Hudson has testified that Jensen became verbally combative, asking who had accused him, demanding details and claiming that Hudson had defamed him and illegally detained him.   [Id.].  Later that afternoon Jensen called Wong, the Human Resources Director, to ask for his personnel file and for information as to the faculty members on the committee.

20

[Doc. 30-14 at 3]. Jensen told Wong that he was being "destroyed." [Id.].

Wong was very disturbed by the call. [Id.]. In response to these incidents,

McMahan placed Jensen on administrative leave with pay on that same date

so that WVRT could assess whether his presence on campus posed a risk to

safety. [Id.; Doc. 30-5; Doc. 30-7 at 5].

The WVRT hired an independent forensic psychologist, Dr. Edward

Landis, to examine Jensen and make a recommendation concerning his risk

of being violent in the workplace. [Doc. 30-14 at 3]. Dr. Landis met with

Jensen on February 14, 2011. [Id.]. By March 2, 2011, WCU had not

received Dr. Landis' report and McMahan extended Jensen's administrative

leave with pay for an additional thirty days. [Doc. 30-7 at 5]. The WVRT

received Dr. Landis' report on March 7, 2011. [Doc. 30-14 at 3]. Dr. Landis

found Jensen to be at a low to moderate risk for workplace violence and

readily acknowledged that restrictions to access to campus would be

warranted in view of his impact on his fellow faculty. [Doc. Id. at 23]. Dr.

Landis concluded as follows:

> Dr. Jensen's behavior has led many individuals to feel threatened,
> to fear that he may lose control of himself, and to take various
> steps to avoid him or otherwise protect themselves. He professes
> no understanding of why others are concerned for their safety. ...
> He does appear to have significant maladaptive personality
> characteristics that contribute to his recurring problems, but does
> not acknowledge any need to change his behavior through
> counseling or other intervention toward that end. ... [H]e did not

appear to benefit from counseling mandated by his previous employer.

[Doc. 42-2 at 6]. Dr. Landis also concluded that Jensen had been "less than truthful with supervisory staff and was evasive during the current evaluation." [Id.].

While the WVRT was awaiting Dr. Landis' report, Hudson continued his investigation into prior incidents of workplace violence. [Doc. 30-5 at 3]. He interviewed the faculty member at the University of North Florida who had filed a complaint against Jensen and learned that the college had required Jensen to undergo anger management treatment. [Id.]. Hudson also learned that Jensen had a police report filed against him when he worked at Southern Polytechnic State University in Georgia. [Id.]. At the conclusion of the WVRT investigation, the team concluded that restricting Jensen's access to the campus was warranted. [Id.].

On March 18, 2011, the WVRT reported to McMahan that Jensen had violated the WCU policy on workplace violence, Policy 63, and in view of the investigation, including Dr. Landis' report, concluded that he should not return to campus. [Doc. 30-7 at 4-5]. McMahan met with Interim Provost Stanford (Stanford), Wong and Mary Ann Lochner (Lochner), WCU General Counsel. [Id.]. They determined that Jensen should not return to campus. [Id.]. Although Jensen had not been reappointed, he had one year remaining on his

employment contract with WCU. Therefore, the decision was made to provide him alternate work assignments that could be performed at home. [Id.]. Jensen's income was not reduced in any manner. [Id.]. Indeed, throughout the remainder of Jensen's terminal year at WCU, he received his full pay and benefits. [Doc. 30-6 at 2].

Jensen appealed the decision to deny his reappointment and the appeal was heard before the Faculty Hearing Committee on April 19, 2011. [Doc. 30-7 at 5]. Jensen was present. [Doc. 36-8]. The Committee found no evidence to support Jensen's claim that he had not been reappointed due to personal malice. [Doc. 42-7].

Part of Yates' job as the CM Department Head included making course assignments for the faculty of the CM Department. [Doc. 30-7 at 4-5]. As such, it was her responsibility to formulate an off-campus work plan for Jensen. [Id.]. She developed a plan for the remainder of the spring 2011 semester and made no assignment for the summer 2011 session because the class which Jensen had been teaching during the summer was cancelled due to low enrollment. [Id. at 6]. Jensen had a grant which he had received in conjunction with Mau, another CM Department faculty member. [Id.]. McMahan advised Yates and Zhang that if any money remained in the grant, Jensen should be provided with an option to work on the grant. [Id. at 14].

23

Yates advised McMahan that there were funds remaining in the grant to cover course development for the summer 2011 session and Jensen could work on that course. [Id. at 13].

Jensen filed a grievance concerning his teaching assignments for the summer of 2011. [Doc. 48-2 at 1-3]. Jensen claimed that he had a contract with WCU to teach during summer sessions and that he was being deprived of his full salary under the terms of the grant. [Id.]. A grievance hearing was conducted on June 22, 2011. [Id. at 4]. Yates advised Jensen that no contract for summer teaching had been located and as a result, Jensen's position that he had such a contract was rejected. [Id.]. In response, Jensen claimed that he had a verbal contract with the former head of the CM Department. [Id.]. Jensen's position was rejected. [Id.]. It was further explained that the course he had been slated to teach had been cancelled due to low enrollment. [Id.]. Yates also pointed out that the same type of cancellation had occurred as to other courses and other professors. [Id.]. Regarding the grant, Yates informed Jensen that the funding for the grant had been significantly reduced by the granting agency. [Id.]. Nonetheless, Jensen and Mau, the lead principal investigator, would each be paid the sum of $6,400.00 in two installments. [Id.]. The parties do not dispute that Jensen has further pursued this grievance against WCU by initiating an action in state court against the

24

university.

Elizabeth Lofquist (Lofquist) was the Associate Provost at WCU during the summer of 2011. [Doc. 30-6]. She has provided an affidavit in which she stated that Jensen was a nine-month employee with WCU and had no guarantee of summer employment. [Id.].

On June 13, 2011, Jensen through counsel requested a serious sanctions hearing in connection with the decision to restrict his access to campus. [Doc. 43-1]. On June 21, 2011, Lochner, acting in her role as General Counsel, informed Jensen's attorney that he would not be afforded a serious sanctions hearing before the Faculty Hearing Committee because Jensen was neither a tenured faculty member nor under a contract for a stated term. [Id.]. Lochner nonetheless scheduled a new hearing to consider Jensen's non-reappointment. [Id.].

In the fall of 2011, Jensen was originally scheduled to teach two on-line courses . [Doc. 30-15 at 7]. He refused to teach one of those courses and Yates reassigned that course to another faculty member. [Id.]. The second course which Jensen was to teach was cancelled due to a lack of enrollment. [Id.]. Although Jensen did not teach any courses during the fall semester, he was paid his full salary. [Id. at 8]. In the spring of 2012, Jensen was assigned two on-line courses which he taught. [Doc. 30-10 at 1]. He received his full

25

salary and benefits during the 2011-2012 academic year.  [Id.].  The spring

2012 semester was his last semester at WCU.  [Id.].

## DISCUSSION

**The Plaintiff's §1983 claim for denial of due process.**

Jensen's first cause of action is brought pursuant to 42 U.S.C. §1983 for

violation of his due process rights based on his being denied a "serious

sanctions hearing" either prior to or after his being barred from campus.  In his

Complaint, Jensen refers to this claim as a "stigma plus" claim based on

"serious damage to his professional reputation plus injury to his ability to work

presently and in the future." [Doc. 15 at 27-28].

The relief Jensen seeks on this ground is somewhat limited.

Recognizing that the Eleventh Amendment precludes the recovery of

monetary damages from the state, Jensen seeks injunctive relief against

WCU and UNC in the form of reinstatement as a professor until such time as

he is afforded a serious sanctions hearing.  [Id.].   He further seeks

compensatory damages against the individual Defendants in their individual

capacities. [Id.].  All the Defendants argue that Jensen states no due process

claim on these grounds.  In addition, the individual Defendants argue that

even if such a due process right exists under these circumstances that they

are entitled to qualified immunity.

In order to analyze this claim the Court must first clearly identify the actions for which Jensen claims he was entitled to a hearing. He demanded and received a full hearing regarding the decision to eny his reappointment [Doc. 30-7 at 5], at which he was present and had a full opportunity to be heard. [Doc. 36-8]. Likewise, he demanded and received a hearing regarding the changes to his teaching assignments. [Doc. 48-2]. From an adverse ruling in that matter Jensen has appealed to state court. The only action for which Plaintiff asserts this due process claim is his exclusion from campus because of his temper and potentially violent tendencies. This action was taken in two steps. First, he was placed on administrative leave with pay on the day that he reacted with substantial anger to the notice that he had not been reappointed. [Doc. 30-5; 30-7 at 5]. Second, after Jensen's examination by a forensic psychologist and a further background investigation by campus public safety, he was not allowed to return to campus. [Doc. 30-7 at 4-5]. Even though Jensen obviously participated in this process by cooperating with the forensic psychological examination, he contends that his due process rights were violated.

"[I]n order to claim entitlement to the protections of the due process clause ... a plaintiff must first show that he has a constitutionally protected 'liberty' or 'property' interest[.]" Stone v. University of Maryland Medical

System Corp., 855 F.2d 167, 172 (4th Cir. 1988) (internal citations omitted).

Plaintiff has argued that there are two protected interests that were infringed:

1) an interest arising from the UNC Policy Manual, and 2) his interest in his

reputation.

The Policy Manual provision at issue is Section 603, which reads in

pertinent part:

> DUE PROCESS BEFORE DISCHARGE OR THE IMPOSITION
> OF SERIOUS SANCTIONS.
>
> (1) . . .[A] faculty member may be *discharged from employment,*
> *suspended, or demoted in rank* for reasons of:
>
> . . .
>
>> (c) misconduct of such a nature as to indicate that the
>> individual is unfit to continue as a member of the
>> faculty. . . . To justify serious disciplinary action, such
>> misconduct should be either (i) sufficiently related to
>> a faculty member's academic responsibilities as to
>> disqualify the individual from effective performance of
>> university duties, or (ii) sufficiently serious as to
>> adversely reflect on the individual's honesty,
>> trustworthiness or fitness to be a faculty member.
>
> *These sanctions* may be imposed only in accordance with the
> procedures prescribed in this section.  For the purposes of this
> Code, a faculty member serving a stated term shall be regarded
> as having tenure until the end of that term.

[Doc. 39-11 at 1](emphasis added).   Plaintiff argues that this provision

provides him with a right to a "serious sanction hearing" before he can be

excluded from campus upon a finding that he posed a danger or security

28

threat.

There are three problems with Plaintiff's argument. First, the scope of §603 does not extend to the action taken by the University. It applies to discharge, suspension and demotion, but Jensen is not complaining herein about his discharge, suspension or demotion. The non-renewal of his appointment was the subject of a different proceeding in which Plaintiff concedes he was allowed due process. He complains about what was, in substance, a change in the location where he was to perform the duties of his job. Though his teaching duties were later altered, those decisions were the subject of yet another proceeding which is now pending in the state courts. The terms of §603 simply do not apply. Second, there is nothing in the language of §603 that indicates it applies to security decisions. Plaintiff complains about his exclusion from campus based on a determination that he was dangerous. He was nonetheless allowed to continue as a member of the faculty, and to teach online courses. As such, the University's decision was not an employment sanction, but rather was a security consideration based on campus safety. Section 603 has no application to this. Third, state law or regulation cannot create a due process right greater than that recognized by federal law. See, Hamilton v. Mayor & City Council of Baltimore, 807 F.Supp.2d 331, 359 (D.Md. 2011) (quoting Gray v. Laws, 51 F.3d 426, 438

29

(4th Cir. 1995) ("Constitutional due process requirements 'are defined by the Constitution and do not vary from state to state on the happenstance of a particular state's procedural rules.'"). For these reasons, Plaintiff cannot base his due process claim on his denial of his rights under § 603.

This brings the Court to the Plaintiff's assertion that he was deprived of some more general liberty interest aside from that set forth in the Policy Manual. In this he "has identified the constitutional right at issue as the right to procedural due process when governmental action threatens a person's liberty interest in his reputation and choice of occupation." Ridpath v. Board of Governors Marshall University, 447 F.3d 292, 307 (4th Cir. 2006) (citing Board of Regents v. Roth, 408 U.S. 564, 573 & n.12, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).[4] This is what has come to be called a "stigma plus" claim, based on the Supreme Court's holding in Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). In his Complaint, Jensen specifically identifies his due process § 1983 claim as being a "stigma plus" claim. [Doc. 15 at 27, ¶ 249]. The elements of a "stigma plus" claim are as follows.

First, there must have been some stigmatizing governmental disclosure. Paul, 424 U.S. at 706; Roth, 408 U.S. at 573; Ridpath, 447 F.3d at 307. Part

---

[4]Jensen has not claimed any protected property interest in his employment as an untenured employee whose contract was to terminate in 2012. Id. at 308 n.14.

and parcel of the requirement that the disclosure be stigmatizing is that the disclosure be false. Sciolino v. City of Newport News,Va., 480 F.3d 642, 646 (4th Cir.), cert. denied 552 U.S. 1076, 128 S.Ct. 805, 169 L.Ed.2d 606 (2007); Stone, 855 F.2d at 173 n.5.

Second, the disclosure must have been voluntarily published by the defendants. Sciolino, 480 F.3d at 646; Ludwig v. Board of Trustees of Ferris State University, 123 F.3d 404, 410 (6th Cir. 1997).

Third, there must be some harm *in addition to* the harm to ones reputation, such as a discharge from employment or significant demotion. Paul, 424 U.S. at 706; Ridpath, 447 F.3d at 309; Stone, 855 F.2d at 172 n.5. That is the "plus" of "stigma plus".

Fourth, there must be some deprivation of due process in that no proper opportunity to be heard and defend was afforded, either before the action was taken or in remediation thereof.

As explained below, Plaintiff's forecast of evidence fails particularly as to the second and third elements.

Regarding the second element that the stigmatizing information must have been voluntarily published by the Defendants, Plaintiff is unable to cite to any direct disclosure by any Defendant, but rather points only to two unusual instances as constituting such publication: testimony in the state court

assault trial of Ford and the information placed in Plaintiff's own personnel file.

With regard to the Ford trial,[5] Ford's attorney cross-examined the Plaintiff herein (Jensen) about the reasons about his removal from campus, and later Dr. Wong testified as to the reasons for Jensen's exclusion. Plaintiff has not presented this Court with any authority, however, that would support classifying these communications as defamatory disclosures by the Defendants in the context of a "stigma plus" action.[6] First of all, Ford's attorney was not in any manner a spokesperson for or agent of any of the Defendants. He was the attorney for *Ford* (who is not a Defendant herein). On this point Plaintiff's counsel argued at the summary judgment hearing in this matter that a campus police officer was present at the Ford trial and that the police officer must have said something to Ford's attorney, and thus the statement of the police officer constitutes a publication by the Defendants. This, however, is pure conjecture. There is nothing in the record as to what the police officer said or what knowledge he had, or what authorization he had to speak on behalf of any Defendant. Not even his identity is revealed. To

---

[5] This is apparently the trial based on the charges Patterson lodged against Ford.

[6] Plaintiff has the additional problems that the disclosures came from his own mouth and that Ford's attorney made no statements but rather only asked questions. The Court, however, need not address whether these are fatal to Plaintiff's case because Plaintiff has failed to present any evidence that anything spoken by Ford's attorney constituted a disclosure by any Defendant.

allow this to stand as a forecast of evidence of a defamatory communication made by the Defendants is to heap inference upon inference to the point of utter speculation.  Bouchat, 346 F.3d at 522.

Plaintiff fares no better with regard to the issue of Dr. Wong's testimony. On cross-examination, Dr. Wong was asked to provide the reason for Jensen's removal from campus and he responded that the removal occurred due to Jensen's temper. [Doc. 41 at 24].  This answer, however, was not voluntarily provided but was given in response to a question posed in the context of Dr. Wong's role as a witness at trial.  Ludwig, 123 F.3d at 410. Both parties and witnesses are entitled to absolute immunity from liability that may stem from their testimony in any judicial proceedings.  Ridpath, 447 F.3d at 312 (citing Briscoe v. LaHue, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983)); see also, Amr v. Virginia State University, 2009 WL 112829 at 10 (E.D.Va., Jan. 14, 2009), aff'd 331 F. App'x. 194 (4th Cir. 2009), cert. denied __ U.S. __, 130 S.Ct. 2386, 176 L.Ed.2d 779 (2010).  As such, this publication of the information about Jensen is both privileged and involuntary.  Thus, to the extent that Dr. Wong appeared on behalf of WCU and UNC, the Defendants, including Dr. Wong, this testimony cannot be the basis for Plaintiff's claim.

Plaintiff also makes the curious argument that the Defendants have

33

published the allegedly stigmatizing determination that the Plaintiff is potentially dangerous in that they are required to place it in his personnel file. [Doc. 41 at 24]. On this point the Plaintiff has submitted a supplemental; statement of authorities citing Sciolino, 480 F.3d 642, and Ledford v. Delancy, 612 F.2d 883 (4th Cir. 1980). In Ledford the Court of Appeals said that a person

> has a right that his personnel file contain no substantially false information with respect to his work performance or the reasons for his discharge when that information is available to prospective employers.

Id. at 887.

The Plaintiff argues there is a statutory requirement that State agencies maintain a record of every employee's date and type of promotion, demotion, transfer, suspension, separation or change in position classification. N.C. Gen. Stat. §126-23(a)(9). He argues that this provision requires stigmatizing information to be placed in his file and that he has had no opportunity for a name-clearing hearing. Jensen, however, does not complain about being demoted, transferred, suspended, separated or changed in position classification. The action at issue does not fall within the scope of the statute. As such, this information would not be among the information required to be included. Therefore, even if a potential employer were to obtain Jensen's personnel records, the dangerousness determination would not be included.

34

See, N.C. Gen. Stat. §126-22 (precluding the inspection of personnel files of former state employees except as allowed by §126-23(a)(9)). Moreover, any such claim fails because Jensen "must allege more than that his [personnel] file 'may be available' to [a potential employer]." Sciolino, 480 F.3d at 650. He must present evidence, in opposition to this Motion for Summary Judgment, of the likelihood that prospective employers will inspect his file and become privy to the "stigmatizing" information. Id. Jensen has presented nothing more than speculation as to this possibility. Id. (to sustain such a claim, the plaintiff must show that his former employer routinely releases personnel files to inquiring employers and/or to certain employers that he intends to apply to and also that the prospective employer is likely to request the same). Harrell v. City of Gastonia, 392 F. App'x. 197, 204 (4th Cir. 2010) (plaintiff failed to present any specific evidence regarding the City's policy for releasing information contained in his personnel file to other agencies or to the public). Here, Plaintiff's evidence is actually the opposite. The information about his exclusion from campus is not among what would be available to prospective employers under §126-23(a)(9). Thus his forecast of evidence shows that it is *un*likely that this information would be disseminated in ths manner,

    In addition, it should be noted that even if Plaintiff were correct in

arguing that the dangerousness determination *must* be placed in Plaintiff's personnel file pursuant to state statute, and that there are circumstances wherein such personnel information must be disclosed to prospective employers, then such publication could not meet the element that the publication be *voluntary*. <u>Amr</u>, 2009 WL 112829 at 10.

For these reasons, Plaintiff's forecast of evidence of the second element of his "stigma plus" claim completely fails. He fails to present a forecast of evidence of any defamatory communication voluntarily published by any Defendant. As such, there is no genuine issue as to any material fact on this issue and the Defendants are entitled to judgment as a matter of law.

The failure of the Plaintiff to fulfill this second element of a due process §1983 claim, however, is not the only reason the Defendants are entitled to summary judgment on this count. Even if the Court were to conclude that there were some voluntary publication on the part of Defendants, the evidence nonetheless is deficient. With regard to the third element, Plaintiff must show that he suffered something in addition to the "stigmatizing" disclosure. "[I]n order to deprive an employee of a liberty interest, a public employer's stigmatizing remarks must be 'made in the course of a discharge or significant demotion.'" <u>Ridpath</u>, 447 F.3d at 309 (quoting <u>Stone</u>, 855 F.2d at 172 n.5) (other citations omitted).

Accordingly, under what is sometimes referred to as its 'stigma plus' test, the Paul [424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)] Court instructed that no deprivation of a liberty interest occurs when, in the course of defaming a person, a public official solely impairs that person's *future* employment opportunities, without subjecting him to a *present* injury such as termination of government employment.

Ridpath, 447 F.3d at 309 n.16 (emphasis in original) (other citations omitted).

Indeed, the United States Supreme Court has "never held that mere defamation of an individual, whether by branding him [dangerous] or otherwise, [is] sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment." Iota Xi Chapter of Sigma Chi Fraternity v. Patterson, 566 F.3d 138, 147-48 (4th Cir. 2009) (quoting Paul, 424 U.S. at 706). "[I]injury to reputation by itself is not a liberty interest protected under the Fourteenth Amendment." Siegert v. Gilley, 500 U.S. 226, 233, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), overruled on other grounds Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The "[p]ublication of stigmatizing charges alone, without damage to tangible interests such as employment does not invoke the due process clause." Johnson v. Morris, 903 F.2d 996, 999 (4th Cir. 1990) (internal quotation omitted); Ludwig, 123 F.3d 404 (in order to implicate liberty interest in one's reputation, the stigmatizing statements must be made in conjunction with the plaintiff's termination in employment). See also, Stone, 855 F2d at

173.

While it is true that Plaintiff's appointment was not renewed, that was the subject of another proceeding wherein Plaintiff concedes he was afforded due process. Plaintiff has presented no authority for the proposition that in a "stigma plus" claim that the "plus" can be something for which due process was fully provided. To adopt such a proposition would be to eliminate the "plus" element required by Paul and Siegert. As such, Plaintiff has failed to present a forecast of evidence sufficient to fulfill the third element of a "stigma plus" due process claim, and therefore the Defendants are entitled to judgment as a matter of law.[7]

Lastly, even if Plaintiff had presented a forecast of evidence showing a due process violation had occurred, the individual Defendants have asserted the defense of qualified immunity.

> Qualified immunity protects [officials] who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful. Following the Supreme Court's recent decision in Pearson [v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)], [courts] exercise [their] discretion to use the two-step procedure of Saucier [v. Katz, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)] ... that asks first whether a constitutional violation occurred and second whether the right violated was clearly

---

[7] It should also be noted that the Plaintiff has presented no forecast of evidence that the information regarding his dangerousness or his exclusion from campus as a result thereof is false. Thus, Plaintiff has failed with regard to the first element as well.

established.

Henry v. Purnell, 652 F.3d 524, 531 (4th Cir.), cert. denied ___ U.S. ___, 132 S.Ct. 781, 181 L.Ed.2d 488 (2011) (internal quotations and citations omitted). For the reasons stated above, it appears that there was no due process right at all, but even if there were, it cannot be deemed to be a clearly established right.  The due process arguments made by Plaintiff are at best tenuous.

Jensen's argument on this score relates to Lochner's allegedly erroneous interpretation of the university's policy concerning his entitlement to a serious sanctions hearing under §603 of the policy manual. Lochner, an attorney, interpreted the policy as not requiring such a hearing under the circumstances of excluding a faculty member from campus due to a risk of violence when there was no concomitant suspension, demotion, or reduction in pay.  In fact, the policy itself specifically states that it pertains to the administration of "these sanctions" (i.e. termination, suspension or demotion). Plaintiff makes no cogent argument as to why this provision extends beyond its terms, much less how such extension is "clearly established."  With respect to Jensen's administrative leave with pay while the WVRT investigated the risk of violence, he "had no clearly-established procedural due process right to a pre [leave] hearing because [he] [was] put on leave with pay."  Dias v. Elique, 436 F.3d 1125, 1132 (9th Cir. 2006) (citing Cleveland Board of Educ.

39

v. Loudermill, 470 U.S. 532, 545, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)).

Moreover, Jensen thereafter was returned to his normal position with the only change being his not being allowed on campus. Without more, Jensen cannot show that this was a clearly established right. Jones v. Bd. of Governors of Univ. of N.C., 704 F.2d 713, 717 (4th Cir. 1983) (because federal constitutional standards rather than state regulations define the requirements of procedural due process, not every deviation from an agency's regulations is of constitutional significance).

It bears reiterating that the decision to exclude Jensen was based on a determination that he was potentially dangerous. The initial decision was made immediately after an incident where he reacted violently to being informed that his reappointment had been denied. The permanent decision was made after Jensen's examination by a forensic psychologist and a further background check. Schools at all levels need to be able to take action with regard to dangerous individuals for the purpose of protecting their students, faculty and staff. The suggestion that a dangerous person must be afforded an opportunity to be heard and general due process before he may be excluded from the premises would appear to be a recipe for disaster.

For these reasons, there are no genuine issues as to any material fact concerning Plaintiff's due process §1983 claim, and therefore the Defendants

40

are entitled to judgment as a matter of law.

**The Plaintiff's breach of contract and Whistleblower claims.**

Jensen has conceded that the breach of contract and Whistleblower claims against WCU and UNC must be dismissed because those entities have not waived their Eleventh Amendment immunity. [Doc. 40]. He also conceded that the Eleventh Amendment bars any suit against the individual Defendants in their official capacities.[8] [Id.]. He nonetheless claims that this dismissal must be without prejudice because this Court lacks subject matter jurisdiction.

Section1983 does not support any claim against a state for violations of state law. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), overruled in part on other grounds Will v.Michigan Dept. of State Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("[I]t is difficult to think of a greater instrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."). WCU and UNC are agencies of the State of North Carolina and therefore are entitled to Eleventh Amendment immunity. Huang

---

[8]Jensen seeks to "keep intact the claim for damages against the named persons." [Doc. 40 at 1]. The Supreme Court of North Carolina has held that a claim against an individual under North Carolina's Whistleblower Statute contains the same elements as a federal First Amendment retaliation claim. Newberne v. Department of Crime Control & Public Safety, 359 N.C. 782, 788, 618 S.E.2d 201 (2005). For that reason, the individual Whistleblower claims are addressed in the section regarding the First Amendment claim, *infra*.

v. Board of Governors of Univ. of North Carolina, 902 F.2d 1134, 1138-39 (4th Cir. 1990). The Eleventh Amendment also bars claims against the individual Defendants sued in their official capacities. Pennhurst, 465 U.S. at 121, 104 S.Ct. 900.

> Eleventh Amendment immunity has aspects of both subject matter and personal jurisdiction, but it does not fall under either category. Further, the Fourth Circuit has not ruled on whether dismissing a suit on Eleventh Amendment immunity grounds is a dismissal for failure to state a claim under Rule 12(b)(6) or a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1).[9]

Blackburn v. Trustees of Guilford Technical Community College, 822 F.Supp.2d 539 (M.D.N.C. 2011) (citing Constantine v. Rectors and Visitors of George Mason University, 411 F.3d 474, 481 (4th Cir. 2005)) (other internal citations omitted). Given the fact that a state may waive this immunity, the Eleventh Amendment does not automatically destroy original jurisdiction. Id. The Amendment instead provides the legal authority to a state to assert the defense. Id.

Nonetheless, the United States Court of Appeals for the Fourth Circuit in Constantine first determined whether the Eleventh Amendment barred the claims, stating that it would consider whether the allegations state a claim only if the Amendment did not erect such a bar. Constantine, 411 F.3d at 483. In

---

[9]The Defendants here assert both such grounds. [Doc. 31 at 16].

42

other words, the Court of Appeals initially addressed this issue as one of jurisdiction under 12(b)(1).  Hutto v. South Carolina Retirement System, __ F.Supp.2d __, 2012 WL 4482936 (D.S.C. 2012).  This would indicate that this Court has no jurisdiction on this claim, and so the merits of this claim will not be addressed.  Since the merits have not been considered, the dismissal of this claim will be without prejudice.  Revere v. Wilmington Finance, 406 F. App'x. 936 (6th Cir. 2011).

This ruling renders moot Jensen's Motion for Relief from Order. [Doc. 51].  The Court does note, however, that counsel erroneously styled that motion as brought pursuant to Federal Rule of Civil Procedure 60(b)(1) & (6). Rule 60(b) applies only to final orders; it does not govern relief from interlocutory orders.  American Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 514 (4th Cir. 2003).  The denial of the Plaintiff's motion to voluntarily dismiss was not a final order because it is subject to reconsideration at any time prior to entry of a final judgment.  Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1469 (4th Cir. 1991).[10]

For these reasons, Plaintiff's Whistleblower claims against the University

---

[10]Counsel also failed to include a certification that he consulted with opposing counsel prior to filing the motion.  "Any motions other than for dismissal, summary judgment, or default judgment shall show that counsel have conferred or attempted to confer and have attempted in good faith to resolve areas of disagreement[.]"  L.Cv.R. 7.1(B).

43

Defendants and against the individual Defendants in their official capacities are dismissed without prejudice.

**The Plaintiff's First Amendment claim.**

> The First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right. A plaintiff seeking to recover for First Amendment retaliation must allege that (1) [ ]he engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendants' conduct.

Constantine, 411 F.3d at 499; Newberne, 359 N.C. at 788 (citing the same elements for a state Whistleblower claim).[11]

The Defendants apparently concede that Jensen's reporting of the harassment allegations of two students constitutes protected First Amendment activity as no discussion of this element is contained within their brief. [See, Doc. 31 at 16-17]. Rather, their position is that the Plaintiff has presented no evidence that the conduct undertaken by the Defendants; that is, the vote to deny reappointment and Plaintiff's subsequent removal from the campus, were causally related to any such protected speech. Id. "To establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the

---

[11]As previously noted, the Court considers the federal and state Whistleblower claims against the individual Defendant in their individual capacities together with this First Amendment claim as the elements are the same. Newberne, 359 N.C. at 788. See note 8, *supra*.

defendant was aware of [his] engaging in protected activity." <u>Constantine</u>, 411 F.3d at 501.

Every member of the committee who voted to deny reappointment, with the exception of Zhang, has provided an affidavit stating that at the time of the vote, he or she was unaware of the harassment incidents and that no discussion of those topics occurred during the meeting. [Doc. 30-1; Doc. 30-2; Doc. 30-3; Doc. 30-4; Doc. 30-8; Doc. 30-12]. While Zhang admits that he knew about those incidents, he has provided an affidavit in which he states that the harassment reports and Jensen's involvement therewith were not discussed at all during the committee meeting. [Doc. 30-15].

Jensen nonetheless argues that he has presented evidence showing that there was a causal connection between his reports of the harassment claims and his non-reappointment and removal from campus. Jensen argues that the Defendants "began to plan for ways to remove" him beginning in September 2010. [Doc. 41 at 20]. In support, Jensen cites the following:

1.  Jensen first reported the harassment allegations to Zhang in February 2010, after which Jensen perceived that Zhang became hostile to him, [Doc. 36-1], leading to Zhang's harsh review of Jensen on May 7, 2010. [Doc. 30-15 at 3-4].

2.  Zhang began making a timeline of events involving Jensen in August or

September of 2010. [Doc. 36-5 at 2].  Zhang did not testify that the timeline involved the harassment allegations or Jensen's reports thereof but instead testified that it related to evaluations of Jensen for reappointment. [Id.].

3.      In an email dated September 16, 2010, McMahan asked Dr. Wong during his upcoming interview of Bretz to inquire whether she mentioned Ford's harassment to her advisor. [Doc. 38-9].

4.      The night before McMahan's September 17, 2010 meeting with Jensen, McMahan met with Lochner, WCU's General Counsel, and Dr. Wong, the harassment investigator, to inquire whether his agenda for that meeting was appropriate. [Doc. 36-4 at 87].

5.      McMahan met with Jensen on September 17, 2010 to scold him for not reporting the harassment claims in a timely manner.  Jensen argues that Lochner secretly listened to the meeting via a speakerphone in the room. [Doc. 41 at 7].  He *argues* that Yates attended that meeting and was surprised to learn, after Jensen had left, that Lochner had been listening. [Doc. 36-10 at 2-3].  During her deposition, however, Yates testified that she did not know if Lochner had been listening during the meeting. [Id. at 6].  She did, however, recognize Lochner's voice on the speaker phone after the meeting was over, but she did not know how long

46

Lochner may have been on the phone. [Id. at 6-8].

6.      Lochner testified that after the September 17 meeting with Jensen, McMahan called her. [Doc. 36-3 at 18]. She did not realize that she was on a speakerphone. [Id.]. She spoke to McMahan in a stern manner but could not explain the subject matter due to attorney client privilege. [Id.]. Lochner adamantly denied surreptitiously listening in the meeting. [Id. at 17-18].

7.      On October 12, 2010, Lofquist met with Jensen, Yates, Burke and Jack Patterson. [Doc. 36-12 at 6]. During that meeting, Jensen expressed concern that due to issues within his department he might not be reappointed. [Id. at 6-8].

8.      On October 27, 2010, Jensen made a memo to himself about passing Zhang in the hall. [Doc. 39-2]. According to Jensen, Zhang told him to look for another job after all the trouble he had caused around there and laughed. [Id.].

9.      Jensen *argues* that Zhang instituted a "witchhunt" against Jensen due to the harassment complaints and determined to call for a collegiality vote in retaliation.

10.      Ball's November 2010 vote against reappointment is evidence that Zhang was determined to oust Jensen despite Ball's testimony that his

47

sole reason for the negative vote was based on Jensen's service as an editor on a journal in which Jensen was published. [Doc. 30-2].

11.  Jensen *argues* that Zhang was instrumental in advocating for the January 26, 2011 college collegiality committee vote.

Jensen asserts that the points listed above constitute direct evidence that the adverse action; that is, nonreappointment and removal from campus, were retaliatory. The problem with Jensen's argument is that few of these points are even admissible evidence, and none of them tend to prove any causal connection between Jensen's statements regarding the harassment allegations and any decision regarding Jensen's position. While such evidence may tend to show that Zhang and McMahan were interested in seeing that Jensen not be reappointed, that in no way connects that interest to Jensen's statements about the harassment. Taken in the light most favorable to Jensen, the evidence of a causal connection is as follows: (1) in February 2010 Jensen told Zhang of harassment allegations, although the detail of such disclosure is not in evidence; (2) thereafter, Jensen perceived that Zhang was not accommodating to him; (3) in late summer 2010, Zhang began assembling a timeline of evidence relating to Jensen's temper and lack of collegiality; (4) on October 27, 2010, Zhang made a statement to Jensen that he should look for another job, which Jensen perceived as an indication

48

that he would be forced out; (5) on January 26, 2011, the collegiality review committee for the Kimmel School unanimously voted not to reappoint Jensen; and (6) Zhang was a member of that committee. Unlike cases in which an adverse employment action is taken shortly after the statements at issue, in this case there is little to tie the reports of harassment to the final decision. "A lengthy time lapse between the [public official's] becoming aware of the protected activity and the alleged adverse ... action ... negates any inference that a causal connection exists between the two." Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1988), abrogated on other grounds Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

In this respect, the case of Huang v. Bd. of Governors of the Univ. of N.C., 902 F.2d 1134 (4th Cir. 1991) is instructive. There, a professor at North Carolina State University made statements concerning alleged financial improprieties. Thereafter, certain faculty members began complaining of his lack of collegiality and bad temper, leading to a demotion and transfer to another department. Huang sued claiming that the adverse action was due to his statements concerning finances. The Court of Appeals affirmed the grant of summary judgment for the defendants because there was an insufficient forecast of evidence as to causation. Id. at 1140. "The causation requirement

49

is rigorous; it is not enough that the protected expression played a role or was a motivating factor in the retaliation." Ruttenberg v. Jones, 283 F. App'x. 121, 130 (4th Cir. 2008) (quoting Huang, 902 F.2d at 1140)). A plaintiff "must show that 'but for' the protected speech, the alleged retaliatory conduct would not have occurred." Id. at 131.

Here, there is no temporal proximity between the reports of harassment and the adverse action. Jensen may not rely solely on the fact that the adverse action happened to follow his February and/or August 2010 reports of alleged harassment. Constantine, 411 F.3d at 500 (noting that there must be some degree of temporal proximity). Rather, Jensen must show that but for those reports, he would have been reappointed in January 2011 and would not have been removed from campus following that non-reappointment.

It is undisputed that the committee's vote was unanimous; that is, Zhang did not act alone in voting against reappointment. Every committee member who voted, with the exception of Zhang, has testified that they knew nothing about either the harassment allegations or Jensen's involvement therein. See, Bradley v. South Carolina Dept. of Corrections, 2010 WL 883729 (D.S.C. 2010), affirmed 385 F. App'x. 345 (4th Cir. 2010) (no proof beyond the plaintiff's own affidavit that terminating official knew of speech). They also testified that no one told them about those allegations during the meeting at which the vote

was taken.  Likewise, every voting committee member has testified that his or her vote was based solely on Jensen's lack of collegiality.  Indeed, both Ferguson and Stone have testified that they shared with other committee members their negative experience with Jensen and that both of them feared for their safety as a result of Jensen's behavior.  See, Siskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008) ("Workers are shielded from retaliation on account of their assertion of rights protected under [the Constitution].  But a complaining worker is not thereby insulated from the consequences of ... poor performance.").  Even if Jensen had presented a forecast of evidence that Zhang was motivated to remove him because of his statements, there is no evidence that those reports of harassment led to the unanimous vote against reappointment.  See, Baltimore Sun Co. v. Ehrlich, 437 F.3d 410, 420 (4th Cir. 2006) (a public official's malicious intent alone does not amount to a retaliatory response).

For these reasons, the Court concludes that Jensen has failed to present a forecast of evidence with regard to the causation element of the First Amendment retaliation and Whistleblower claims.  Therefore, the Defendants are entitled to summary judgment on these claims.

**The Plaintiff's civil conspiracy claim.**

The Defendants argue that the Jensen has not alleged or shown a

conspiracy among the individual Defendants to violate his constitutional rights. Jensen's sole response to this allegation is that because he has shown constitutional violations, he has shown a conspiracy. That is insufficient to withstand summary judgment.

Indeed, as a result of the rulings herein that Jensen has not established any constitutional violations, the civil conspiracy claim must be dismissed. "It is well established that 'there is not a separate civil action for civil conspiracy in North Carolina.'" Esposito v. Talbert & Bright, Inc., 181 N.C. App. 742, 747, 641 S.E.2d 695 (2007), disc. rev. denied, 362 N.C. 234, 659 S.E.2d 440 (2008) (quoting Dove v. Harvey, 168 N.C. App. 687, 690, 608 S.E.2d 798 (2005)). Because summary judgment for the Defendants is appropriate as to the federal constitutional claims, Jensen's "claim for civil conspiracy must also fail." Id.; In re McAlpine Group, LLC, 2010 WL 6138195 (Bkr.W.D.N.C. 2012); Piraino Bros., LLC v. Atlantic Financial Group, Inc., 712 S.E.2d 328 (2011), review denied 365 N.C. 357, 718 S.E.2d 391 (2011).

**The Plaintiff's defamation claim.**

The sole remaining claims is Jensen's state law claim for defamation against the individual Defendants Hudson, McMahan and Zhang. Having dismissed all claims over which it has original jurisdiction, the Court will decline to exercise supplemental jurisdiction over this claim. 28 U.S.C. §1367(c)(3);

<u>Glynne v. Wilmed Healthcare</u>, 699 F.3d 380 (4th Cir. 2012).


## ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Relief from Order [Doc. 51] is hereby **DENIED** as moot.

**IT IS FURTHER ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 30] is hereby **GRANTED** and this action is hereby **DISMISSED** in its entirety. Such dismissal is without prejudice as to Plaintiff's Whistelblower claims against the University Defendants and the individual Defendants in their official capacities and as to Plaintiff's defamation claim. As to all other claims this dismissal is with prejudice.

Judgment is entered simultaneously herewith.

Signed: December 28, 2012

Martin Reidinger
United States District Judge